IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

MARILYN E. HOLMES FOR
MEREDITH HOLMES (DECEASED),

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

    Defendant.

No. C14-0049

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.    *INTRODUCTION* .................................................. 2

II.   *PRINCIPLES OF REVIEW* ....................................... 2

III.  *FACTS* ............................................................... 4
    A.   *Holmes' Education and Employment Background* ............... 4
    B.   *Vocational Expert's Testimony from the Administrative Hearing* .... 4
    C.   *Meredith's Medical History* ...................................... 5

IV.  *CONCLUSIONS OF LAW* ........................................ 11
    A.   *ALJ's Disability Determination* ................................. 11
    B.   *Objections Raised By Claimant* .................................. 14
        1.   *Natvig's and Pillers' Opinions* ............................... 14
        2.   *RFC Assessment* .............................................. 17

V.    *CONCLUSION* ..................................................... 20

VI.  *ORDER* ............................................................. 20

## I. INTRODUCTION

This matter comes before the Court on the Amended Complaint (docket number 4) filed by Plaintiff Marilyn E. Holmes ("Marilyn") on August 17, 2014, requesting judicial review of the Social Security Commissioner's decision to deny her daughter, Meredith Holmes' ("Meredith") application for Title II disability insurance benefits.[1] Marilyn asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and find that Meredith was disabled and entitled to benefits. In the alternative, Marilyn requests the Court to remand this matter for further proceedings.[2]

## II. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'"

---

[1] The claimant, Meredith Holmes, died on July 31, 2013. Marilyn Holmes is Meredith's surviving parent. On November 7, 2013, Marilyn filed a Notice Regarding Substitution of Party Upon Death of Claimant, with the Social Security Administration. *See* Administrative Record at 8. Accordingly, Marilyn is the substituted party for Meredith's pending appeal.

[2] On August 18, 2014, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

2

*Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d

1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## III. FACTS

### A. Holmes' Education and Employment Background

Meredith Holmes was born in 1971. She did not graduate from high school, but later earned a GED. Her past work included daycare worker, computer repair technician, cashier, telemarketer, hotel front desk attendant, hand packager, and hotel room service worker.

### B. Vocational Expert's Testimony from the Administrative Hearing

At the hearing, the ALJ provided vocational expert Deborah A. Determan with a hypothetical for an individual who:

> can lift or carry occasionally 50 pounds, frequently 25 pounds, stand or walk six hours of an eight-hour workday, sit six hours of an eight-hour workday. Limited to simple, repetitive tasks with no more than occasional interaction with the public, coworkers, or supervisors.

(Administrative Record at 80-81.) The vocational expert testified that under such limitations, Meredith could not perform her past relevant work. The vocational expert testified, however, that Meredith could perform the following jobs: (1) laundry worker, (2) cook/helper, and (3) production soldering worker. The ALJ provided the vocational expert with a second hypothetical for an individual who can:

> Lift or carry occasionally 20 pounds, frequently 10; stand or walk four hours of an eight-hour workday, with the

> understanding the individual can stand or walk no more than
> one hour continuously; sit six hours of an eight-hour workday;
> never climb ladders, occasionally stairs; no more than simple
> repetitive tasks; occasional interaction with the public,
> supervisors, and coworkers[.] . . . Avoid concentrated
> exposure to hazardous work environment.

(Administrative Record at 83.) Again, the vocational expert testified that under such limitations, Meredith could not perform her past relevant work. The vocational expert testified, however, that Meredith could perform the following light sedentary jobs: (1) addresser, (2) information clerk, and (3) document preparer.

### C. Meredith's Medical History

On May 15, 2009, Meredith was admitted to the Mental Health Institute ("MHI") in Mt. Pleasant, Iowa, on referral from St. Luke's Hospital in Cedar Rapids, Iowa. Dr. Martin W. Carpenter, M.D., described Meredith's "history of present illness" as follows:

> Meredith stated she has had severe substance abuse problems
> since 2006. She was consumed with using "crack," but has
> not used for the past 6-9 months. She recently switched to
> using methamphetamine which eventually got her into legal
> problems. In 2/2007, her children were taken from her and
> this caused depression and anxiety to increase. It is
> documented that she has current problems with medication non
> compliance and keeping follow-up appointments when she is
> not institutionalized. She adamantly does not want to be here
> because she cannot smoke while she is here. She describes her
> current mood as extremely anxious and her sleep is horrible.
> Her appetite is fair, she has no energy, no interest, some guilt
> and she endorses problems with memory and concentration.
> Her anxiety is high and she does have occasional panic attacks,
> but she cannot elaborate on this. She endorses mania. She
> denies suicidal or homicidal ideation. She endorses
> posttraumatic stress. She denies any eating disorders or
> obsessive compulsive disease. She stated she hears the radio

> and people talking in her head. In a darkened room she also
> sees "shadow people."

(Administrative Record at 635.) Dr. Carpenter further noted that Meredith had a past psychiatric history of depression, severe anxiety, and thought disorder. Lastly, Dr. Carpenter indicated that Meredith started using drugs when she was 15, including methamphetamine, crack, marijuana, heroin, LSD, and cocaine.

Dr. Carpenter opined that Meredith "seemed to improve" over the course of her treatment at MHI. She was treated primarily with medication. At the time of discharge, Meredith was diagnosed with bipolar affective disorder, methamphetamine abuse, generalized anxiety disorder, and borderline personality disorder. Her GAF score at admission was 30, and upon discharge it was 50. Dr. Carpenter opined that Meredith's prognosis was "fair." She was discharged on June 15, 2009, and ordered to continue her medications. Additionally, she was discharged to outpatient care at the Area Substance Abuse Council in Cedar Rapids, Iowa.

On September 23, 2009, Meredith was referred by Disability Determination Services ("DDS") to Dr. Danice F. Klimek, M.D., for a consultative examination. Dr. Klimek reviewed Meredith's medical history as follows:

> She states she began having problems with her feet in 2007 and was initially seen by Dr. Knudson. She was diagnosed with a bone spur on the right foot and underwent surgery to have this removed. . . . She states she was then seen again in the Summer of 2008 by a doctor at Mercy Hospital and diagnosed with neuropathy of both feet. . . . She states that she is currently being followed by Dr. Knudson at the Iowa Foot and Ankle Clinic and continues to use medication to assist with her pain, which does not seem to help. She complains of constant pain in both heels, which is made worse with weight bearing activities, especially walking. . . . She states she is never pain-free, and at best her pain is 4/10, on average is 4/10. and at worst is 8/10. . . .

> She states she was diagnosed with depression, anxiety, bipolar disorder, antisocial and borderline personality many years ago. . . . She states she is currently being followed by a doctor at the Cedar Centre and is being treated with medications and counseling. She states she has been hospitalized more than ten times for her mental health issues and states she has had suicidal or homicidal ideations, though she is not currently feeling suicidal or homicidal.

(Administrative Record at 924-25.) Meredith reported using methamphetamine, marijuana, cocaine, heroin, and LSD in 2009. She denied the current use of illegal substances. Upon testing, Dr. Klimek found Meredith's:

> Range of motion was within normal limits. She moved about the room with an easy gait. She declined attempting to heel walk, citing heel pain, but was able to toe walk without difficulty. She was able to squat without difficulties. She was able to get on and off the examination table without difficulty. . . .
>
> Muscle strength testing was 5/5 throughout. Toe flexors and extensors had 5/5 strength. Seated leg raising was negative.

(Administrative Record at 926-27.) Dr. Klimek determined that Meredith had no physical restrictions. Dr. Klimek concluded that "[t]he physical examination was essentially unremarkable. Movements were easy and nonlabored. Range of motion and muscle strength were intact."[3]

On October 22, 2009, Dr. Scott Shafer, Ph.D., reviewed Meredith's medical records and provided DDS with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Meredith. On the Psychiatric Review Technique assessment, Dr. Shafer diagnosed Meredith with bipolar affective disorder, major depressive disorder, generalized anxiety disorder, borderline personality disorder, and polysubstance dependence. Dr. Shafer determined that Meredith had the following

---

[3] Administrative Record at 927.

limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Shafer found that Meredith was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. Dr. Shafer concluded that:

> [Meredith] was able to obtain and perform employment until she stopped due to pregnancy. Her condition has been complicated by ongoing substance usage and lack of treatment compliance. [Medical evidence of record] indicates some improvement with treatment when compliant. [Activities of daily living] indicate [Meredith] can participate in her daily responsibilities. [She] retains the ability to understand, remember, and follow basic instructions. Her attention, concentration, and pace are adequate for routine tasks not requiring sustained attention. She can interact appropriately with workers and supervisors on a very limited basis. Her judgment is adequate to adjust to changes in the workplace with added support.

(Administrative Record at 940.)

On August 12, 2010, Dr. Aaron Quinn, Ph.D., reviewed Meredith's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Meredith. On the Psychiatric Review Technique assessment, Dr. Quinn diagnosed Meredith with bipolar II disorder, mood disorder, generalized anxiety disorder, borderline personality disorder, and polysubstance dependence. On the mental RFC assessment, Dr. Quinn found that Meredith was moderately limited in her ability to:

understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Dr. Quinn concluded that:

> [W]hen not using substances, [Meredith's] level of functioning, while severe, will not meet-equal listing level severity. [Meredith's] substance use is largely responsible for her functional difficulties (as is well documented in the [medical evidence of record]), while she does improve overall when abstinent and treatment adherent. As such, [she] is able to complete simple, repetitive tasks on a sustained basis when she is substance-free. [Meredith] is expected to have difficulties with extended attention, detailed instructions, stress management/pace, interpersonal functioning, judgment and change[.] . . . [She] would benefit from limited interactions with others.

(Administrative Record at 1314.)

On March 31, 2011, Dr. Russell Lark, Ph.D., reviewed Meredith's medical records and provided DDS with a mental RFC assessment for Meredith. Dr. Lark found that Meredith was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic

9

goals or make plans independently of others. Dr. Lark concluded that Meredith's mental medically determinable impairments are:

> Bipolar I Disorder, [] Recent episode Depressed Mood, G[eneralized Anxiety Disorder], Polysubstance Dependence; and Borderline P[ersonality Disorder]. M[edical evidence of record] and [activities of daily living] indicate [Meredith] can handle daily responsibilities and navigate her community independently. Her attention, concentration, and pace may vary with her mood but are adequate for tasks not requiring sustained attention. She will likely have problems getting along with others as third party noted that she can be demanding and controlling. The preponderance of evidence in file indicates that [Meredith] is able to complete simple, repetitive to moderately complex tasks on a sustained basis if she is allowed to work independently of others as needed.

(Administrative Record at 1501.)

On April 13, 2011, Kathy Pillers, LMSW, a treating social worker, filled out a "Report on Incapacity" for Meredith. Pillers diagnosed Meredith with bipolar I disorder, depressed mood, generalized anxiety disorder, polysubstance dependence, and borderline personality disorder. Pillers opined that Meredith's condition was "permanent" and would "likely" require long-term support. Pillers indicated that Meredith was capable of caring for children in her home and participating in classroom training or instruction for less than 10 hours per week. Pillers opined that Meredith was unable to perform work of any kind due to "extensive" mental health problems. Pillers recommended that Meredith apply for long-term disability benefits.

On December 3, 2012, at the request of Meredith's attorney, Ellen Natvig, PA-C, a treating physician's assistant, filled out a "Mental Impairment Questionnaire" for Meredith. Natvig diagnosed Meredith with major depressive disorder, generalized anxiety disorder, and polysubstance dependence. Natvig indicated that Meredith's treatment response was "fair," especially for anxiety. According to Natvig, Meredith's prognosis

was also "fair." Natvig identified the following signs and symptoms for Meredith: generalized persistent anxiety, mood disturbance, substance dependence, and sleep disturbance. Natvig opined that Meredith was seriously limited, but not precluded from the ability to: maintain regular attendance and be punctual within customary, usually strict tolerances, complete a normal workday or workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and respond appropriately to changes in a routine work setting. Natvig also opined that Meredith was unable to meet competitive standards in the ability to: deal with normal work stress and deal with stress of semi-skilled and skilled work. Natvig determined that Meredith had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Lastly, Natvig opined that Meredith would miss about four days per month due to her impairments or treatment for her impairments.

## IV. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Meredith was not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the

> impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could

12

perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Meredith had not engaged in substantial gainful activity since November 1, 2010. At the second step, the ALJ concluded from the medical evidence that Meredith had the following severe impairments: polysubstance abuse, affective disorder, anxiety disorder, personality disorder, and obesity. At the third step, the ALJ found that Meredith did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Meredith's RFC as follows:

> [Meredith] has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: limited to simple repetitive tasks; the employment can have no life or death decisions; no employments requiring high productivity goals, such as employments paid by the piece; no employments in which the job duties include confrontational situations; and no more than occasional interaction with the public or coworkers.

(Administrative Record at 21.) Also at the fourth step, the ALJ determined that Meredith could not perform her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Meredith could have worked at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Meredith was not disabled.

### B. Objections Raised By Claimant

Marilyn argues that the ALJ erred in two respects. First, Marilyn argues that the ALJ failed to properly evaluate the opinions of Ellen Natvig, Meredith's treating physician's assistant, and Kathy Pillers, a licensed social worker who worked with Meredith. Second, Marilyn argues that the ALJ's RFC assessment for Meredith is flawed because it is not supported by substantial evidence in the record.

#### 1. *Natvig's and Pillers' Opinions*

Ellen Natvig, a physician's assistant, and Kathy Pillers, a licensed social worker, are not classified as "acceptable medical sources" under the Social Security Regulations. Even though Natvig and Pillers are not "acceptable medical sources," the Social Security Administration ("SSA") requires an ALJ to consider such opinions in making a final disability determination. On August 9, 2006, the SSA issued Social Security Ruling 06-03p. The purpose of Ruling 06-03p was to clarify how the SSA considers opinions from sources not classified as "acceptable medical sources." *See Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-03p). Ruling 06-03p provides that when considering the opinion of a source that is classified as a "not acceptable medical source," such as a physician's assistant, "it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03p. Furthermore, in discussing SSR 06-03p, the Eighth Circuit Court of Appeals, in *Sloan*, pointed out:

> Information from these 'other sources' cannot establish the existence of a medically determinable impairment, according to SSR 06-3p. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special

>knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

*Sloan*, 499 F.3d at 888 (quoting SSR 06-03p). In determining the weight afforded to "other medical evidence," an "ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (citation omitted).

In his decision, the ALJ addressed Natvig's opinions as follows:

>I also considered a *Mental Impairment Questionnaire* completed by [Meredith's] mental health treatment provider, Ellen Natvig, PA-C, on December 1, 2012. Ms. Natvig assessed limitations, which would prevent [Meredith] from engaging in substantial gainful activity. Specifically, she noted that [Meredith] would be absent from work an average of about four days per month secondary to her impairments. I give little weight to Ms. Natvig's assessment because Ms. Natvig is not an acceptable medical source, and her assessment is unsupported by the treatment notes which, from March 2011, assign [Meredith] GAFs []as high as 65.

(Administrative Record at 25.) Furthermore, as the Commissioner points out, the ALJ found Natvig's opinions "inconsistent with the record evidence." For example, in his decision, the ALJ found that:

>The notes from November 2010 through February 2011, documented conservative mental health treatment consisting of mild psychotropic medications[.]

(Administrative Record at 23.) The ALJ also pointed out that Meredith's mental status examinations in December 2010, January 2011, and February 2011 were "unremarkable." Lastly, the ALJ found that "[s]ubsequent notes continued to document treatment consisting of therapy sessions and medication management, with GAF scores of 50 to 65. The

findings from the mental status examinations were generally unremarkable, and mainly documented an anxious mood."[4]

Next, the ALJ addressed Pillers' opinions as follows:

> I considered a Report of Incapacity prepared by [Meredith's] treating therapist[.] . . . [Pillers] noted that [Meredith] was likely to require long-term supportive services. Ms. Pillers noted [Meredith] was able to care for children in the home, but was unable to perform work of any kind secondary to extensive mental health problems. Last, Ms. Pillers indicated she would recommend that [Meredith] apply for long-term disability benefits.
>
> I give Ms. Pillers' assessment little weight for several reasons. Ms. Pillers' conclusion that [Meredith] was unable to work is conclusory and unsupported by the record. As an opinion on an issue reserved to the Commissioner, this statement is not entitled to controlling weight and is not given special significance pursuant to 20 CFR 404.1527(e) and 416.927(e) and SSR 96-5. Additionally, Ms. Pillers is not an acceptable medical source, and an opinion that is not from an acceptable medical source is not entitled to be given the same weight as a qualifying medical source opinion (20 CFR 404.1513(a) and (e); and 416.913(a) and (e)).

(Administrative Record at 24-25.)

Having reviewed the entire record, the Court finds that the ALJ properly addressed and considered Natvig's and Pillers' opinions in accordance with SSR 06-03p. Furthermore, the ALJ properly articulated his reasons for attributing little weight to Natvig's and Pillers' opinions, and for finding their opinions to be inconsistent with the record as a whole. *See Raney*, 396 F.3d at 1010 (Providing that in considering the opinions of a medical source that is not an "acceptable medical source," an "ALJ has more discretion and is permitted to consider any inconsistencies found within the

---

[4] Administrative Record at 24.

16

record."); *see also Sloan*, 499 F.3d at 889 (providing that a factor to consider in weighing evidence from a medical source that is not an "acceptable medical source" is the consistency of such as source's opinions with the record as a whole); *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007) (providing that a medical source opinion may be given limited weight if based on conclusory statements or inconsistency with the record as a whole). Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. RFC Assessment

Marilyn argues that the ALJ's RFC assessment for Meredith is not supported by substantial evidence. In particular, Marilyn asserts that the ALJ's RFC assessment is flawed because it lacks work related limitations from a treating or examining source. Marilyn concludes that this matter should be remanded for "development of the record and new mental residual functional capacity assessment. This matter should also be remanded for further vocational expert testimony in light of the new mental residual functional capacity assessment."[5] The Commissioner disagrees with Marilyn's argument, and asserts that the "ALJ had sufficient evidence, including opinions from state agency medical experts, multiple treatment providers, and [Meredith's] testimony and reported activities, to make an informed decision."[6] The Commissioner concludes that the ALJ's RFC assessment is not flawed, and is based on substantial evidence in the record.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at

---

[5] Plaintiff's Brief (docket number 13) at 18.

[6] Commissioner's Brief (docket number 14) at 13.

1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Additionally, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

In determining Meredith's RFC, the ALJ thoroughly addressed and considered her medical history, including treatment from various doctors and treatment centers.[7] The ALJ also addressed the opinions of the state agency medical sources:

---

[7] *See* Administrative Record at 21-25 (providing a thorough discussion of Meredith's overall medical history and treatment).

> I give great weight to the opinions of the State agency psychologists on initial review and on reconsideration. These opinions are consistent with the evidence of record, which documented significant improvement in [Meredith's] psychiatric symptomatology with abstinence from drugs and psychological treatment.
>
> I note there are several assessments regarding [Meredith's] mental limitations by State agency psychologists, which were assessed in connection with [Meredith's] prior applications. These psychologists all opined [she] was capable of performing simple repetitive tasks with limited interaction with others. I give these opinions some weight, but not full weight, because they were given prior to [her] amended alleged onset date.

(Administrative Record at 25.) In determining a claimant's RFC, an ALJ may rely, in part, on the opinions of non-examining medical consultants such as the State agency consultants in this case. *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004). Finally, the ALJ thoroughly addressed and considered Meredith's subjective allegations and reported activities in determining her RFC.[8] The ALJ concluded that:

> In sum, the above residual functional capacity assessment is supported by the evidence as a whole. [Meredith's] subjective complaints are less than fully credible and the objective medical evidence does not support the alleged severity of symptoms. I find [Meredith] can do work subject to the residual functional capacity determined here.

(Administrative Record at 25.)

Having reviewed the entire record, the Court finds that the ALJ properly considered Meredith's medical records, observations of treating physicians, and Meredith's own

---

[8] *See id.* at 21-23 (providing thorough discussion of Meredith's subjective allegations and reported abilities).

description of her limitations in making the ALJ's RFC assessment for Meredith.[9] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes that Meredith's assertion that the ALJ's RFC assessment is flawed and not supported by substantial evidence is without merit.

## V. CONCLUSION

The Court finds that the ALJ properly considered and addressed the medical evidence and opinions in the record, including the opinions of Ellen Natvig and Kathy Pillers. The Court also finds that the ALJ considered the medical evidence as a whole, and made a proper RFC determination based on a fully and fairly developed record. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VI. ORDER

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;
2. Plaintiff's Amended Complaint (docket number 4) is **DISMISSED** with prejudice; and
3. The Clerk of Court is directed to enter judgment accordingly.

DATED this 9th day of March, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[9] *See* Administrative Record at 21-25 (providing thorough discussion of the relevant evidence for making a proper RFC determination).